684 So.2d 328 (1996)
CONKLIN SHOWS, INC., Appellant,
v.
DEPARTMENT OF REVENUE, Appellee.
No. 94-1055.
District Court of Appeal of Florida, Fourth District.
December 26, 1996.
*329 Robert O. Rogers of Rogers, Bowers, Dempsey and Paladino, West Palm Beach, for appellant.
Robert A. Butterworth, Attorney General, and Lisa M. Raleigh, Assistant Attorney General, Tallahassee, for appellee.
SHAHOOD, Judge.
This is an appeal from a final administrative order of the State of Florida, Department of Revenue (Department) adverse to the appellant, Conklin Shows, Inc. We have jurisdiction pursuant to section 120.68, Florida Statutes (Supp.1996), and rules 9.030(b)(1)(C) and 9.110(a)(2), Florida Rules of Appellate Procedure (1996). We affirm in part and reverse in part the final order of the Department rejecting in part and adopting in part the hearing officer's recommendation.
Appellant, which was engaged in the business of providing midway attractions consisting of rides and food and game concessions for large fairs, contracted with the Southeast Florida and Dade County Youth Fair Association, Inc., (Association) to provide those services for the Association's annual youth fair. The Association and appellant had a course of dealing for over ten years. In order to fulfill this contractual obligation, appellant subcontracted with various ride operators and food and games concessionaires. It is based on those relationships which the Department of Revenue (Department) assessed sales tax under chapter 212, Florida Statutes.
The Department audited appellant's books for Dade County Youth Fairs for the years 1985 through 1990. The audit resulted in the Department's filing of a Notice of Intent finding appellant liable for substantial unpaid taxes plus interest. Appellant then protested the Notice of Proposed Assessment issued by the Department. In May 1992, a Notice of Decision was issued upholding the audit findings. Appellant then initiated an administrative action against the proposed assessment *330 as contained in the Notice of Decision, and the matter was tried before a hearing officer. At the conclusion of the administrative hearing, the hearing officer entered a recommended order deleting the recommended tax assessment with respect to the ride and game concessionaires and affirming the assessment of taxes against appellant for the food concessionaires and for the purchase of items used in the repair or manufacture of goods for import. The Department ultimately rejected the hearing officer's finding and recommendation of no tax liability against appellant for ride subcontractors and games concessions contracts, but affirmed assessment of taxes against appellant relating to its contracts with the food concessionaires.
As stated in the final administrative order, the Department found that the subcontractor ride operators provided all transportation, assembly for the rides, and required personnel. The ride owners also paid all expenses for maintenance and operation in addition to paying appellant a proportionate share of common expenses. Appellant did not take possession of or exercise any control over the physical operation of the rides. The Department concluded, in "Finding of Fact 11," that
[e]ach ride owner collected tickets from the Fair attendees. The [ride] subcontractors would turn their tickets over to appellant. Appellant turned in the tickets for all rides provided by it and its subcontractors to the Association. After [appellant] was paid its percentage by the Association, [appellant] would pay the subcontractors a percentage attributable to their particular ride in accordance with the agreement between [appellant] and that subcontractor. [Appellant] retained a portion of the amount received from the Association for all of the subcontracted rides. The subcontractors did not make any payments to [appellant] nor did [appellant] make any payments to the Association. However, this is true only if the measure of gross proceeds, the tickets are ignored. The tickets presented to appellant by the ride subcontractor at the close of business each day represented a money payment to [appellant] because the tickets were the sole measure of the amount which was to be later retained by [appellant] after both the Association and the subcontractors had share in such gross receipts as such term is described in Petitioner's Exhibit 5, 6, and 7.
Section 212.031(6), Florida Statutes (1991), provides in pertinent part as follows:
(6) The lease or rental of land or a hall or other facilities by a fair association subject to the provisions of chapter 616 to a show promoter or prime operator of a carnival or midway attraction is exempt from the tax imposed by this section; however, the sublease of land or a hall or other facilities by the show promoter or prime operator is not exempt from the provisions of this section.
Based on its reliance on section 212.031(6), Florida Statutes, and rule 12A-1.070, Florida Administrative Code, both providing that a sublicense of land by a show promoter of a carnival or midway attraction is taxable, the Department set forth the following conclusions of law in Paragraph 31 of the final order:

Conclusion of Law 31 It is clear from [appellant's] contracts that the arrangement as structured by [appellant] fall [sic] within the ambit of section 212.031, Florida Statutes. The ride operators collected revenue from the use of their attractions and paid an agreed share of their proceeds to [appellant] for that right to be at the Fair. The method chosen by the [Association] for the accounting security of the cash does not alter either [appellant's] contracts or the real substance of the transactions. [Appellant] was licensing the use of the real property to the ride subcontractors.
The final order concluded that in this case, "where the ride operators collected the revenue, in the form of tickets, and paid them to appellant and the [Association], the ride subcontractors were engaged in the taxable transaction of using real property."
Paragraph 4(c) of the written contract between the ride owners and the appellant, which purportedly supported this view, provided as follows:

*331 At the closing of each engagement constituting one of the engagements, [appellant] and the Contractor hereby agree that the Contractor shall receive from [appellant] those percentages of net receipts of the attractions which are provided for on Schedule "B" for each such engagement and [appellant] shall retain and receive the balance of such receipts. Such percentage shall be calculated and piad [sic] forthwith at the conclusion of each such engagement.
The Department, however, primarily concentrated on an attachment to the contract, entitled "Schedule B." As indicated on the attachment, each subcontractor was obligated under a "percentage payable to appellant" provision whereby, as the Department interpreted, "the express wording of the contracts shows that the clear intent of the parties was that appellant was to receive an agreed upon amount of the revenue received by each ride subcontractor." The Department held that the amount received by appellant was for the right to use the real property on which to set up and operate the subcontractor rides. Hence, according to the Department, the revenue received by appellant is clearly subject to taxation.
The Department rejected the argument that if the contract with the ride subcontractors were not construed as a license to use real property, appellant's profits from the ride subcontracts would still be taxable as proceeds of a lease of tangible personal property. Addressing that issue, the final order stated:
[T]he owner of the ride retained full control over the operation of the ride limited only by some general conditions imposed by the Association. Those conditions did not rise to the level of direction or control that would subject the transaction to tax under [rule 12A1.071(10)(a)and (c), Florida Administrative Code]. Instead, the transaction is more properly viewed as an exempt service transaction under [rule 12A-1.070(10)(d)] pursuant to which appellant paid for the furnishing and servicing of equipment.
Despite this conclusion, the Department assessed sales tax based on its finding that appellant granted the ride operators a license to use real property. This was clearly error by the Department.
It is axiomatic that a hearing officer's function is to consider all evidence presented, resolve conflicts, judge credibility of witnesses, draw permissible inferences from the evidence, and reach ultimate findings of fact. Heifetz v. Department of Business Regulation, 475 So.2d 1277, 1281 (Fla. 1st DCA 1985). When evidence presented supports two inconsistent findings, it is the hearing officer's function to resolve the issue, one way or the other, and neither the Department nor this court may overturn the hearing officer's findings based on disputed issues of fact. Id.; see also Boyd v. Department of Revenue, 682 So.2d 1117 (Fla. 4th DCA 1996). The record in this case contains competent substantial evidence to support the hearing officer's findings of fact and conclusions of law relative to the assessment of sales tax arising from appellant's business relationship with the ride operators. See Boyd. We accordingly reverse this portion of the Department's final order.
Appellant's relationship with the games concessionaires also resulted in an assessment of sales tax on licensing fees pursuant to the Department's rejection of the existence of a joint venture between appellant and the games subcontractors. Not unlike appellant's relationship with the ride operators, appellant did not incur any expenses associated with the operation of the games. The games concessionaires agreed to pay appellant's contractual percentage and rental taxes due and owing to the Association as set forth in the agreement between appellant and the Association.
No evidence existed in the record to show that there was any contract, express or implied, which created a joint venture. Appellant failed to introduce a written agreement memorializing a partnership relationship. The Department found no evidence of joint control, no authority to mutually bind the other party, and no mutual exposure to losses. The only evidence presented by appellant was a statement from the 1986 fair showing that appellant and the game concessionaires each received fifty (50) percent of the game receipts. In addition, an employee *332 of appellant testified that the net proceeds were divided equally between appellant and the game concessionaires and that appellant contributed to any losses incurred. Based on the evidence, or lack thereof, the Department concluded that appellant did not satisfy its burden of proving all elements necessary to show the formation of a joint venture. We agree.
Appellant nevertheless contends that its contribution of its right to the use of the real property, the game concessionaires, contribution of labor and capital, along with an equal distribution of profit and loss, constitutes a nontaxable business relationship. Revenue generated from a joint venture is not taxable under section 212.031, Florida Statutes.
As stated in Kislak v. Kreedian, 95 So.2d 510 (Fla.1957), the concept of a contract is one well recognized in law. It is a legal relationship. It contemplates an agreement enforceable at law between two or more parties for the doing or not doing of some specific thing. A contract must create legal obligations. Id. at 515.
In order to establish a joint venture, the following essential elements must be proven, in addition to the essentials of an ordinary contract:
(1) a community of interest in the performance of the common purpose, (2) joint control or right of control, (3) a joint proprietary interest in the subject matter, (4) a right to share in the profits and (5) a duty to share in any losses which may be sustained.
Id.
While it is unnecessary to produce a written agreement for the purpose of establishing a joint venture, the failure to do so is evidence, however slight, that no such agreement actually existed. McKissick v. Bilger, 480 So.2d 211 (Fla. 1st DCA 1985); see also Kislak. As stated by the supreme court in Kislak:
It is an elemental principle that the relationship of joint adventurers is created when two or more persons combine their property or time or a combination thereof in conducting some particular line of trade or for some particular business deal. There must be an agreement to share jointly on some agreed basis in not only profits but also losses. The relationship must arise out of a contract, express or implied. Such a contract is an indispensable prerequisite:
`As between the parties, a contract is essential to create the relation of joint adventurers. The contract need not, however, be expressed or be embodied in a formal agreement, or particularly specify or define the rights and duties of the parties. It may be inferred from the conduct of the parties or from facts and circumstances which make it appear that a joint enterprise was in fact entered into. The consideration for a contract of joint adventure may be a promise, express or implied, to contribute capital or labor to the enterprise.' 30 Am.Jur. Joint Adventures § 9, p. 681.
Kislak, 95 So.2d at 515. The party alleging the existence of a joint venture has the burden of proving an implied or express agreement as well as all of the necessary elements. Id.
The burden is heavier when the transactions alleged to form the basis of the relationship are not in writing. Id. In this case, appellant has not satisfied this heavy burden of proving all elements of the joint venture. In a joint venture, a common business purpose whereby each party needs the other is evidenced by each party's bringing to the relationship capital, skills, labor, licensing, resources or knowledge not possessed by the others. See Arango v. Reyka, 507 So.2d 1211, 1213 (Fla. 4th DCA 1987). Here, appellant did not contribute capital for operating expenses, nor did it contribute services or materials; it merely contributed the right to use the land. With regard to the joint control aspect of a joint venture, appellant failed to demonstrate mutual control over actual running of the games, hiring of personnel, maintenance, and collection of money. In fact, the record shows the games concessionaires had exclusive control over the games operations.
Additionally, inherent in a joint venture relationship is the ability of each party *333 to bind the other, or in other words, the fact that each partner has a personal liability stake in the transaction. Kislak, 95 So.2d at 516. No testimony was elicited to show a mutual intent to bind each other for any liabilities incurred as a result of the operations.
Since appellant failed to prove the existence of a joint venture agreement, we affirm that portion of the Department's final order relating to the assessment of taxes as they relate to the game concessionaires. We find, however, that the Department erred in assessing sales tax as to the ride operators.
Affirmed in part; reversed in part.
POLEN, J., concurs.
WARNER, J., concurs specially with opinion.
WARNER, Judge, concurring specially.
I concur in the majority opinion and write only to note that we are not overlooking the supplemental authority cited to us of sections 162 and 163 of newly enacted Chapter 96-320, Laws of Florida. Section 162 appears to have created an exemption from sales tax for transactions like the ones involved here for the furnishing of amusement devices or attractions. Appellant also cited section 163 which provides that no tax imposed before July 1, 1996, which has not been paid by the taxpayer in a transaction made exempt by such additions is due. That would lead one to the conclusion that the current appeal would be moot on the first point in that the exemption was allowed to be applied retroactively if the taxpayer had not yet paid the tax.
If that were the purpose, the statute does not accomplish it. The exact words of the section are as follows:
No tax imposed by part I of chapter 212, Florida Statutes, before July 1, 1996, which has not been collected or paid by the taxpayer as of the effective date of this act on a transaction that is made exempt from taxation under section 2 of this act is due from the taxpayer with respect to such transaction. (emphasis supplied).
Ch. 96-320, § 163, Laws of Fla. Section 2 of Chapter 96-320 creates and assigns duties and responsibilities to the new Office of Tourism, Trade, and Economic Development. It does not create any new exemptions in the sales tax law. The entire act consists of 168 sections and was the major economic development bill of the 1996 Legislative Session. Perhaps section 163 was tied originally in another bill with section 162 and simply rolled into Chapter 96-320 for legislative action. But in doing so, the reference to section 2 was not changed in section 163. We have not been given any legislative history to help us analyze this act. There are many other sales tax exemptions contained in the bill, any one of which might be retroactively applied and be the subject of section 163 relief. Given the reference only to section 2 of the Act in section 163, I could not say with certainty that the Legislature intended that the retroactive application of the new exemption applies to these transactions. As we affirm on the grounds argued, further analysis of the statute is not necessary.